ESTATE OF MARY PIEROTICH MLADINICH, DECEASED, PEOPLES BANK OF BILOXI, ADMINISTRATOR D.B.N., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Mladinich v. Commissioner
Docket No. 15841-89
United States Tax Court
T.C. Memo 1991-528; 1991 Tax Ct. Memo LEXIS 577; 62 T.C.M. (CCH) 1065; T.C.M. (RIA) 91528; October 24, 1991, Filed *577 Decision will be entered under Rule 155. Lauch M. Magruder, Jr. and Charles L. Brocato, for the petitioner. Linda J. Wise, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Carleton D. Powell pursuant to the provisions of section 7443A(b)(4) and Rule 180. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: Respondent determined a deficiency of $ 774,943 in petitioner's Federal estate tax and an addition to tax of $ 193,867 pursuant to section 6651(a)(1). The issues for decision are (1) whether the so-called Richardson property is includable in decedent's gross estate; (2) whether, *578 if the Richardson property is includable in the gross estate, the property is subject to a lien in the amount of the value of the improvements located thereon; (3) whether respondent correctly determined the value of the land and improvements, and (4) whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to timely file the estate tax return. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Peoples Bank of Biloxi, the administrator of the estate of Mary Pierotich Mladinich, had its principal office in Biloxi, Mississippi, at the time the petition was filed in this case. Decedent, Mary Pierotich Mladinich, was born in 1907. Mary married Andrew Jake Mladinich (Jake Sr.) in 1925. They had two children: Andrew Jake Mladinich, Jr. (Jake Jr.), who was born in 1926, and John M. Mladinich (John), who was born in 1928. Jake Sr. died on March 20, 1967, and decedent died on October 8, 1983. The Richardson Property
Prior to 1951, the Mladinich family lived on First Street in Biloxi, Mississippi. That property was titled in Jake Sr.'s *579 name. Jake Sr. owned and operated a commercial fishing vessel. Decedent worked in a cannery. While fishing, Jake Sr. was at sea approximately 1 week at a time and was ashore 2 or 3 days before returning to sea. John and Jake Jr. worked in various positions in their youth, such as paper boy, bell hop, and short order cook. In 1944, decedent's brother, J.J. Pierotich, had an interest in a service station. The service station and equipment were leased from Munro Petroleum. Jake Jr. and John worked at the station on a regular basis and Jake Sr. occasionally worked at the station when he was ashore. During this period of time, Jake Jr. and John lived with their parents. The Mladinich family wanted to construct and operate a restaurant. With that in mind, Jake Jr. and John attended an auction at the U.S. Coast Guard Air Station in Biloxi, Mississippi, in the spring of 1947. The Coast Guard was closing the Air Station and was selling equipment used at the station. Jake Jr. and John purchased a walk-in cooler, stoves, dishwashers, potato peelers, sinks, stainless steel work tables, chairs, and other equipment for approximately $ 300. Jake Jr. and John paid for the equipment with *580 money that the family had saved. They stored the equipment under the home on First Street and in a shed behind the house. For the next several years, the Mladinich family looked for property suitable for the restaurant. On September 1, 1950, decedent and Jake Sr. purchased the so-called Richardson property on West Beach Boulevard in Biloxi. The deed to that property read to "Jake Mladinich and Mrs. Mary P. Mladinich, his wife, as joint tenants in entirety and not as tenants in common, but to the survivor." The lot is roughly rectangular and is approximately 92 feet wide from east to west and some 1,000 feet deep from north to south. U.S. Highway 90 runs east-west and bisects the property. The portion of the property north of Highway 90 is over 800 feet deep and contained a residence that became the home of Jake Sr. and decedent. The portion south of Highway 90 fronts the Gulf of Mexico. A seawall generally runs east-west through the southern portion of the property. This seawall is approximately 140 feet south of the highway. The purchase price of the Richardson property was $ 23,000. Of this amount, $ 13,000 came from a loan from the First Bank of Biloxi that was repaid *581 immediately when the First Street property was sold. Jake Sr. paid the balance of the $ 23,000. Soon after the Richardson property was purchased, John began to fill in a ravine on the property. Jake Sr., Jake Jr., John, and their acquaintances then constructed a brick building on the southern portion of the Richardson property and installed the kitchen equipment they purchased from the Coast Guard. They opened the Fiesta Restaurant and Lounge in this building in April 1951. [2] The funds for the materials used to build the Fiesta were borrowed from the suppliers and paid for from the profits of the business. During 1952 the building was enlarged and changed to a lounge called "The Fiesta Sand Bar." Jake Sr., Jake Jr., and John ran the business as a partnership under the name of Jake Mladinich and Sons. The partners in *582 Jake Mladinich and Sons never executed a written partnership agreement. In 1954 Jake Sr. and decedent acquired several more pieces of property. One parcel was the beach side of Lot 8 of the L.A. Frederick Survey adjacent to the Richardson property. Another parcel was acquired from Charles and Derinda Frazier on Pat Harrison Avenue. A third parcel, also on Pat Harrison Avenue, was acquired from Gustave and Mrs. Lou Wellbat. In 1955 the partnership constructed and began operation of the Party Store on the north side of the Highway 90 in front of the Mladinich residence. The Party Store was a retail package liquor store. Also in 1955, the partnership began operation of the Hot Stop restaurant on Pat Harrison Avenue. In 1957, the partnership began construction of the Cabana Beach Motel on the southern portion of the Richardson property between the Fiesta Lounge and the beach. It started operation of the motel in 1958. In 1959, a wing was added to the Fiesta Lounge for a restaurant named the Sirloin Room which commenced business about September 1, 1959. The restaurant was renamed the Sea 'n' Sirloin Restaurant. During the 1960s, this restaurant was moved to a new building west *583 of the Fiesta and was not on the Richardson property. [3]
At some point in time the northernmost portion of the Richardson property was leased to the owners of the adjacent property, and tennis courts were built by the tenants. For the tax year 1951, Jake Mladinich and Sons filed a partnership tax return under the name of the Fiesta Restaurant and Lounge. The return indicates the partnership was formed on April 9, 1951, and was a "new business firt [sic] partnership return." The return listed Jake Sr., Jake Jr., and John as equal partners. The partnership filed a partnership tax return for 1952 under the name of the Fiesta Sand Bar which set forth the claimed expenses in detail. No expenses were claimed for depreciation on the building, and no land is included in the partnership assets on the balance sheet. This return *584 also identified Jake Sr., Jake Jr., and John as equal partners. While the Federal information returns for the partnership and the Federal joint income tax returns of decedent and Jake Sr. for the subsequent years are not paradigms of consistency, none of the partnership returns filed from 1951 to 1956 list the Richardson property as a partnership asset. For example, the partnership and individual returns for 1953 and 1954 show rent deducted on the partnership return and rental income on the joint return of decedent and Jake Sr. On its partnership return for 1955 the partnership (using the name Jake Mladinich & Sons) reported income and expenses from the Fiesta Sand Bar, the Party Store, and the Hot Stop restaurant. No rent expenses were claimed. The depreciation schedule shows a total cost of depreciable assets of $ 38,227.82 and does not include any buildings. The balance sheet includes assets of $ 38,227.82 under the heading "Buildings and other fixed depreciable assets." No land is included in the partnership assets. The partnership again identified Jake Sr., Jake Jr., and John as equal partners. The 1956 partnership return presents a different pattern. A partnership return *585 was filed using the name Fiesta Restaurant and Lounge for 1956. A rent expense of $ 3,600 was claimed and no depreciation expense was claimed. Only Jake Jr. and John are listed as partners on this return. A second partnership return using the Party Store name was also filed for 1956. A rent expense of $ 600 was claimed. The depreciation schedule provides, "All fixed assets leased." The balance sheet does not include any depreciable assets or land as assets. Decedent is listed as a partner in the partnership in addition to Jake Sr. and Jake Jr. A third partnership return using the name Hot Stop restaurant was filed for 1956. A rent expense of $ 2,800 was claimed. The depreciation schedule provides, "All fixed assets leased." The balance sheet does not include any depreciable assets or land as assets of the partnership. An individual identified as A.L Rice and John are shown as equal partners. Jake Sr. died intestate on March 20, 1967. Under Mississippi law, his estate generally passed to his wife and two sons in equal shares. Legal title to the Richardson property, however, as property owned by tenants by the entireties, passed to decedent. A Federal estate tax return *586 filed for Jake Sr.'s estate reported ownership by him of one-third of the partnership of Jake Mladinich and Sons, the Party Store and a "Family residence, West Beach, Biloxi". The residence and Party Store also were included as assets of the partnership in the administration of the estate. On July 19, 1967, Jake Jr. and John quitclaimed to decedent any interest they might have acquired or later acquire from the estate of Jake Sr. in the Party Store. Decedent subsequently moved from the residence on the Richardson property to a nearby apartment complex and the house on the Richardson property was converted to a souvenir and gift shop called the Lighthouse Gift Shop. The Party Store and Lighthouse Gift Shop were rented to Ron Pierotich, a cousin. Decedent received the rents from these buildings. In 1968 construction began on the Towers Apartment Building adjacent to the Cabana Beach Apartments. In 1969, Hurricane Camille struck the Mississippi Gulf Coast. The hurricane destroyed the Party Store and damaged the Fiesta, Cabana Beach Motel, and the incomplete Towers Apartment Building. Except for the Party Store, damage to the property was repaired using financing from the Small *587 Business Administration. The Small Business Administration loans were secured by deeds of trust on the Richardson property, executed by decedent, Jake Jr., John, and John's and Jake's wives. The Party Store was rebuilt either by decedent or the tenant. In 1979, Hurricane Frederic struck the Mississippi Gulf Coast. Immediately prior to Hurricane Frederic, the value of Mississippi Gulf Coast property reached a historic high. Hurricane Frederic caused a marked decline in the value of the property. By 1983 or 1984, the property reached a post-Hurricane Frederic high value. Following the death of Jake Sr., rifts developed between Jake Jr. and his brother, John. Prior to her death, decedent strongly urged her sons to break up their joint business ventures so that each could own and run a separate business. Although Jake Jr. and John agreed with their mother that the businesses should be divided, they were unable to agree upon a division of the property, and took no action. On July 8, 1983, decedent executed a warranty deed naming John as grantee of the Richardson property. She delivered the deed to John who had it recorded after her death. No gift tax return was filed. Neither *588 petitioner nor respondent contends that this purported transfer was effective to remove the property from decedent's estate. The Administration of the Estate
Decedent died on October 8, 1983. In her will she named Jake Jr. and John as coexecutors of her estate. The relations between Jake Jr. and John became even more strained, particularly after Jake Jr. discovered the deed from decedent to John. Finally, on May 1, 1984, Jake Jr. filed a complaint against decedent's estate and John, inter alia, to set aside the conveyance of the Richardson property to John. Because of their acrimonious relationship, John and Jake Jr. did little toward the administration of their mother's estate. They did, however, obtain an appraisal of the property. On March 8, 1985, they resigned as coexecutors and the Chancery Court of Harrison County, Mississippi, appointed Peoples Bank of Biloxi as administrator d.b.n. of the estate. After being appointed administrator of decedent's estate, Peoples Bank employed Roger Poulos to appraise the assets of the estate. Mr. Poulos' appraisal of the estate was substantially the same as the appraisal done for Jake Jr. and John. In performing its duties as *589 administrator, Peoples Bank determined that the estate was required to file a Federal estate tax return. On June 26, 1986, prior to the filing of the estate tax return, Peoples Bank, Jake Jr., and John entered into an agreement that provided inter alia that: the filing of said estate tax returns as so prepared shall in no way constitute an admission by John Mladinich that he is not the fee simple title [sic] to that property known as the "Fiesta Properties," and that the filing of said estate tax return further in no way diminishes the claim of A. Jake Mladinich that stated "Fiesta Properties" are owned by the partnership of A. Jake Mladinich & Sons.
The Richardson property was not included in the gross estate on the Federal estate tax return filed for decedent. The estate tax return was filed on the basis that such property was an asset of Jake Mladinich and Sons, a partnership in which decedent held a one-ninth interest. Decedent's interest was a one-third interest in the one-third interest held by Jake Sr. prior to his demise. In determining the value of decedent's interest in the partnership for inclusion in her gross estate, Peoples Bank used the portion of the Poulos *590 appraisal covering real estate owned by the partnership, added the value of other partnership assets, and determined the value of decedent's interest in the partnership to be $ 258,754. The Phillips Petroleum Litigation
In 1977, the Mississippi Mineral Lease Commission (MMLC) granted oil and gas leases to Saga Petroleum U.S., Inc., on properties the MMLC asserted were public trust lands. The Cinque Bambini partnership (Cinque Bambini) and others, who held record title to the property, leased the property to Phillips Petroleum Company. When the record title owners learned of the leases, they filed suit to confirm and remove clouds from their title. The Chancery Court for Hancock County held that the lands influenced by the ebb and flow of the tide at the time of statehood were public trust lands and determined the geographic boundaries of such lands that were the subject of that proceeding. The record titleholder appealed. On May 14, 1986, the Mississippi Supreme Court affirmed the lower court holding that the State held fee simple title to the land influenced by the ebb and flow of the tide at the time of statehood. Cinque Bambini Partnership v. State, 491 So. 2d 508 (Miss. 1986). *591 On February 23, 1988, the decision of the Mississippi Supreme Court was affirmed by the United States Supreme Court. Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 98 L. Ed. 2d 877, 108 S. Ct. 791 (1988). At the time Cinque Bambini and the other record title holders filed their suit in 1977, the State was not asserting any interest in the beach front properties. Furthermore, the State did not take any action to assert any interest in such properties until the United States Supreme Court rendered its opinion in 1988. At that time, the Secretary of State, as successor to the Land Commissioner, felt that a clear mandate had been given to marshal the State's trust lands and appointed a commission to study the problem and develop recommendations for the identification and administration of the tidelands. The Blue Ribbon Commission on Public Trust Tidelands held its first meeting on June 29, 1988, and issued its final report on January 24, 1989. The Mississippi Legislature passed legislation regarding the public trust lands on March 31, 1989. Miss. Code Ann. secs. 29-15-1 through 29-15-23 (1990). Under this legislation, tidelands developed before July 1, 1973, are not public trust property. *592 Tidelands that have not been developed or were developed after July 1, 1973, are public trust property. All of the improvements on the Richardson property that are located on filled land were constructed prior to July 1, 1973. Thus, under the public trust tidelands legislation, the Richardson property is considered to be private property. To complicate the matter, however, the Secretary of State for the State of Mississippi has filed suit against the State to have a portion of the public trust tidelands legislation set aside as unconstitutional. The Secretary of State alleges that the portion of the legislation which removes tidelands developed prior to July 1, 1973, from the public trust violates section 95 of the Mississippi Constitution. That section forbids the State to donate land which it owns or controls to private corporations or individuals. The trial court ruled that the public trust tidelands legislation does not violate section 95 of the Mississippi Constitution. Byrd v. State, Docket No. 17,879 (Chancery Ct., Harrison Co., April 18, 1990). That decision is presently on appeal to the Mississippi Supreme Court. In the statutory notice of deficiency, respondent *593 determined that decedent was the fee owner of the Richardson property, that the fair market value of the property was $ 2,100,000 and that this amount is includable in decedent's gross estate. Respondent used the Poulos appraisal report in determining the value of decedent's estate. Respondent also determined that petitioner was liable for an addition to tax under section 6651(a)(1). OPINION The Richardson Property
Section 2033 provides that the value of the gross estate for Federal estate tax purposes "shall include the value of all property to the extent of the interest therein of decedent at the time of his death." In Federal estate tax controversies, State law governs the issue of "what the decedent owns for purposes of estate taxation"; Federal tax statutes "merely determine how that interest shall be taxed." Estate of Wien v. Commissioner, 441 F.2d 32, 36 (5th Cir. 1971), revg. on another issue 51 T.C. 287 (1968). In Aldrich v. United States, 346 F.2d 37, 38 (5th Cir. 1965), the United States Court of Appeals for the Fifth Circuit stated: The estate tax is imposed on the transfer of the estate. The value of *594 the estate is determined by including the value at the time of his death of all property of the decedent except real property situated outside of the United States. What property the decedent owned at the time of his death must be determined by state law. * * * [Fn. refs. omitted.]
The property in question is located in Mississippi. Accordingly, this Court must examine applicable Mississippi law to determine what decedent owned at her death. The property in issue was conveyed in 1950 to "Jake Mladinich and Mrs. Mary P. Mladinich, his wife, as joint tenants in entirely and not as tenants in common, but to the survivor." By operation of Mississippi law, decedent would have become the sole owner of this property at the death of her husband, Jake Sr., in 1967. Petitioner concedes that record title was in decedent's name, but contends that, under Whitney v. Cotten, 53 Miss. 689 (1876) and Alexander v. Kimbro, 49 Miss. 529 (1873), the land was the property of the partnership of Jake Mladinich and Sons. In Whitney v. Cotten, supra, the Mississippi Supreme Court held that real property purchased with funds of the partnership *595 is a partnership asset. In that case, the surviving partner filed suit against the deceased partners' heirs seeking to have lands previously acquired with partnership funds sold to pay partnership debts. The Court held that real property acquired with partnership funds constituted a partnership asset even though the record title was vested in the name of only one partner. The Court stated, 53 Miss. at 691: It has been uniformly held in this State that real estate bought with partnership funds, or acquired in satisfaction of debts, constitutes assets of the firm, so far as the partners and creditors are concerned, quite as effectually as choses in action or merchandise. The mere fact of the acquisition in that mode works an equitable conversion of them into personal estate. A court of equity will not undertake to disregard the assurances of title under which they are held, but will treat the holder of the title as trustee for the purposes of the partnership: first, to pay the creditors; and, secondly, to adjust the account between the partners according to their several interests.
If the Richardson property was acquired with partnership funds, then, *596 under Whitney v. Cotten, supra, it would be an asset of the partnership. The gravamen of petitioner's contention is that the funds used to purchase the property came from an alleged partnership consisting of Jake Sr., Jake Jr., and John that existed prior to the purchase of the property. The basic problem with which petitioner is confronted is that Jake Sr., Jake Jr., and John at various times have either testified or made statements under oath that stand in sharp contrast to the testimony in this record. The purchase price for the Richardson property was $ 23,000. The First Bank of Biloxi provided a loan of $ 13,000 towards the purchase price. The bank lent the money to Jake Mladinich and decedent. They repaid the bank on November 2, 1950, from the proceeds of sale of the First Street residence, which was titled in the name of Jake Sr. Thus, Jake Sr. and decedent signed the loan and repaid the bank from the sale of their residence. Accordingly, the Court finds that the bank loan does not represent partnership funds used to purchase the Richardson property. The source of the remaining $ 10,000 is in dispute. Petitioner contends that $ 5,000 came from the profits of *597 the gasoline station and $ 5,000 came from a loan from Jake Sr.'s aunt, Katie Mladinich. The testimony with regard to participation in and earnings from the service station was conflicting. Whatever interest Jake Sr., Jake Jr., and John may have had in the service station, that interest was not liquidated until after the purchase of the Richardson property. Nor are we convinced the property was purchased by funds accumulated over the years from this alleged partnership. John and Jake Jr. testified that the alleged Mladinich partnership owned a one-half interest in the service station and that their uncle, J.J. Pierotich owned the other half. John testified that his father did not draw any money from the station and that he and Jake Jr. received an allowance from the station of approximately $ 5 or $ 6 per week until he became engaged and started drawing a salary of $ 40 per week. Jake Jr., on the other hand, testified that he did not receive an allowance or salary from the service station. Ron Pierotich, the son of J.J. Pierotich, testified that his father, John, and Jake Jr., received the same salary of $ 25 to $ 30 per week. Finally, Donald Munro, who testified on behalf *598 of petitioner and whose family owned the service station property, stated that the station was leased to the uncle and that John and Jake Jr. worked for the uncle. Moreover, neither John nor Jake Jr. knew what, if any, profits were made on the service station. John stated that their family received half the earnings of the station. He further testified that his uncle gave their share to his mother who then deposited the money into the bank. John could not say how his uncle gave the money to his mother nor did he know the amount that was given. When questioned concerning the money that his uncle had allegedly given to his mother from the station, John replied, "You didn't stick your nose into the family affairs that deep." Further, even the testimonies of John and Jake Jr. provide no bases for concluding that any savings were accumulated from their earlier jobs or from the service station. During this period they owned a car, sail boats, and a speedboat. While both testified that when they needed money they went to their mother, who gave it to them, on this record it is impossible to determine whether they received back all or even more than they may have turned over to their *599 mother. We further note that during part of the period in which the funds were allegedly accumulated, John was married. In short, the picture that is painted is that, while growing up and as young adults, the lifestyle of Jake Jr., and John was not one of total deprivation but rather one of reasonable indulgence under somewhat limited circumstances, and it is implausible that any portion of the funds used to purchase the Richardson property came from Jake Jr. and John. The evidence regarding the alleged family loan from Katie Mladinich is equally unsatisfying. Ms. Diana Kuljis, the daughter of Katie Mladinich, testified that her mother loaned the Mladinich family some amount of money at some point in time. Petitioner claims this testimony establishes the fact that Katie Mladinich lent the money to Jake Sr., John, and Jake Jr., as the partners of Jake Mladinich and Sons. We find the testimony of Ms. Kuljis to be too vague to support petitioner's position. Jake Sr., Jake Jr., and John all testified previously that Jake Sr. was the source of the funds used to purchase the Richardson property. [4] While the court in that case rejected the testimony of Jake Sr. and his sons that *600 Jake Sr. had a $ 35,000 cash hoard after the purchase of the Richardson property, it appears to this Court more likely that Jake Sr. and decedent had sufficient savings to pay the $ 10,000 balance for that property than their sons. [5] In arriving at this conclusion, we also note that decedent worked for many years, a fact which petitioner ignores. *601 In sum, we find that, consistent with prior statements and testimony, Jake Sr. and decedent were the source of the funds used to purchase the Richardson property, and, therefore, the Richardson property is not considered to be partnership property under the rule of Whitney v. Cotten, supra.
Alternatively, petitioner contends that under Alexander v. Kimbro, supra, even if the Richardson property had not been purchased with partnership funds, the intentions of the parties result in the real estate's being treated as partnership property. In Alexander v. Kimbro, the surviving partner brought suit against the heirs of two deceased partners seeking to have real property owned by the three parties as tenants in common sold, and the proceeds distributed to the tenants in common. The defendants argued that the lots involved were partnership property. The Court stated, 49 Miss. at 537: Whether the appropriation of land to the uses of the partnership, without its being purchased with partnership funds, will operate to render it partnership property, will very much depend upon the intention of the parties and the evidence *602 of that intention. It seems to be settled, that the mere fact that property held by the firm as tenants in common, is used in and for the partnership business, or a mere agreement to use for partnership purposes, is not of itself sufficient to convert it to partnership stock. There must be some evidence of further agreement to make it partnership property.
Thus, the Richardson property would be partnership property only if the parties intended the property to be partnership property at the time it was purchased. We do not find evidence of that intent here. First, the very act of taking title in the names of Jake Sr., and decedent as tenants by the entirety indicates a clear intention that the Richardson property not be treated as partnership property. The language used in the conveyance manifests an intention to create a tenancy by the entirety, which can only be entered into by a husband and wife. See Shepherd v. Shepherd, 336 So. 2d 497 (Miss. 1976); Cuevas v. Cuevas, 191 So. 2d 843 (Miss. 1966). [6]
*603 Petitioner contends, however, that the property was placed in the name of Jake Sr. and Mary only because Mississippi did not allow property to be put in the name of a partnership at that time. While petitioner's statement is correct, Mississippi law did allow property to be placed in the name of the individual partners as tenants in common. Therefore, if the partners did intend the land to be partnership property, they could have placed title in the individual names of the partners. We also have considered the manner in which the parties used the property. In addition to the commercial development, Jake Sr., and decedent used a portion of the property as their residence. They moved to the Richardson property after selling the First Street property, which was held in the name of Jake Sr. We find it highly unlikely that they intended their home to become a partnership asset. Next we examine how the parties treated the property for tax purposes. The returns filed by Jake Sr. and decedent and by the partnerships in the early fifties also indicate that the property belonged to the parents, not to any partnership. On the 1953 return for the Fiesta Sand Bar, the partnership claimed *604 a rental expense of $ 5,000 while Jake Sr. and decedent reported rental income of $ 5,000 on their 1953 individual return. Jake Sr. and decedent did not own any property other than the Richardson property and the residence was not used for business. The Fiesta building was constructed in the early part of 1951. The correlation in the rent expense claimed and the income reported is repeated in the following year. In 1954, the Fiesta Sand Bar claimed rent expense of $ 9,100, and Jake Sr., and decedent reported rental income in the same amount. [7]
Finally, we have considered how the parties treated the property among themselves. Prior to her death, decedent delivered to John a warranty *605 deed conveying to him the Richardson property. Petitioner contends that she did this to force Jake Jr., to the bargaining table. That may be true, but the fact that decedent thought that she had that type of leverage depended on her belief that she owned the Richardson property. In the trial in this case, John asserted that the deed from his mother did no more than convey to him his mother's one-ninth interest in the partnership. He took an entirely different position in the suit instituted by Jake Jr. as a result of the deed from decedent to John. The following exchange occurred in the deposition of John in connection with that proceeding: Q. Mr. Mladinich, why do you contend in this lawsuit that your mother owned the Fiesta property in spite of your comments today that the partnership operated those properties since 1950? A. My comment was we operated the business as a business, but my mother and father always owned the property. [Emphasis added.]
This comports with our view of the situation. Petitioner refers to the Petition for Leave to Mortgage Real Property filed in Harrison County Chancery Court during the administration of the estate of Jake Sr. to demonstrate *606 that the Richardson property was partnership property in the collective conscience of the Mladinich family. That sworn petition, signed by decedent, Jake Jr., and John, states that "the major part of the estate of Jake Mladinich, Sr. is an interest in real property owned by the partnership of Jake Mladinich and Sons." But at that time, as in this case, it was in their interest to take that position. The inventories filed in Jake Sr.'s estate proceeding and John's deposition in the suit against his brother were also sworn documents, and the estate tax return was signed under penalties of perjury, but each of these give differing accounts of the ownership of the property. The Chancery Court petition simply underscores the fluid nature of Jake Jr's. and John's treatment of the ownership of the Richardson property. Petitioner finally argues that respondent, in previous income tax cases, treated the Richardson property as a partnership asset in computing income by the net worth method and that such treatment is entitled to great weight. Compare Thomas v. Commissioner, 324 F.2d 798 (5th Cir. 1963), vacating a Memorandum Opinion of this Court. In the previous tax *607 cases of the Mladinich family, [8] however, ownership of the Richardson property was not litigated. The agent who investigated the case used a joint net worth computation because he could not determine which of the Mladinich family members owned the assets due to their refusal to provide such information. Furthermore, the property had no effect on the net worth computation since its value was the same at the beginning and end of each year for which income was determined. The income determined would have been the same if the agent had entirely eliminated the Richardson property, had placed the full value in one family-member's net worth statement, or had divided it among them in any manner. The agent did not have any evidence to establish who purchased the property or made the improvements. Since ownership of the Richardson property among the family members was not litigated and was not significant in the prior cases, we will not treat it as significant in this case. Based upon the foregoing, *608 we conclude that decedent owned the Richardson property on the date of her death. The Richardson Property Improvements
Petitioner argues alternatively that, if the Court finds decedent was the owner of the Richardson property for Federal estate tax purposes, then the partnership of Jake Mladinich and Sons is the owner of the improvements upon the land. The Court agrees in part with petitioner on this issue. There appear to be no Mississippi cases which directly address the question of how to treat improvements made with partnership funds for partnership purposes on land owned by one of the partners. We look, therefore, to the law of other jurisdictions for guidance. While there appears to be a split of authority, the majority view is that partners are entitled to a lien on partnership property in the amount of improvements made with partnership funds on real property of a partner. In Grissom v. Moore, 106 Ind. 296, 6 N.E. 629 (1886), a partnership was formed to engage in the milling business. One partner, Martz, agreed to contribute milling machinery if the other, Grissom, would construct a mill on land owned by him and convey an undivided *609 one-half interest in the lots and building to Martz. Upon Grissom's death, cross-suits were brought to quiet title in the undivided one-half interest. There was no record of any rent paid by the partnership for the use of the lots and building, nor was there any agreement as to how the improvements were to be divided upon dissolution of the partnership. After ruling that the wife's inchoate dower rights, in property seized by her husband during marriage (the lots), could not be defeated by any agreement short of a conveyance in which she was joined, the court observed, "The question still remains, did she take any interest in the improvements?" 6 N.E. at 630. The court cited the general rule that "Improvements made even on lands owned by one partner, if made with partnership funds, or for the purpose of the partnership, are to be treated as the personal property of the firm," 6 N.E. at 631, and then went on to note: As we have already seen, the inchoate right of the wife in the lots was not subject to be defeated by the agreement with Martz. Her interest attached by virtue of the seizin of her husband, and he was seized *610 before the agreement was made. It was not so with respect to the improvements. * * * Since they were the contributions of the partners to the capital of the firm, they became partnership assets the same as if they had been acquired with the funds of the partnership, and are to be treated as personal property belonging to the firm. * * *
Similarly, in Flint v. Flint, 87 N.J. Eq. 560, 100 A. 754 (Ch.), affd. 88 N.J. Eq. 346, 102 A. 1053 (Err. & App. 1917), a partnership was formed for the retail selling of butter, eggs, poultry, and dairy products. An office and storage building, stable, and wagon shed were erected on land owned by one of the partners for $ 9,000. The buildings were constructed with partnership funds and were used for partnership purposes. There was no agreement as to how the improvements would be divided upon dissolution. After the death of one of the partners, the surviving partner, who owned the land, paid $ 14,000 to the widow of the deceased partner for the estate's interest in the assets of the partnership, including the value of the improvements. The deceased partner's heirs at law maintained *611 that the improvements were real estate and that an interest therein descended to them upon the partner's death. The court noted that the owner of the real estate had conceded that "the fact that the land was the land of one of the partners and the improvements were made with partnership funds operates to prevent the owner of the soil from asserting, as against the partnership and its representatives, the right to hold the improvements without some compensation." 100 A. at 755. It then proceeded to discuss the disposition of the improvements. The question is, What is the right of the partnership? Is it a right in the property or a right against the property? Is it a right of ownership in the property, or is it in the nature of a lien against the property for the value put into it? I think the latter. What the partnership used was money, personal property. This money was used to purchase personal property. That personal property was put upon real estate, and although its physical nature was not in any wise altered, it became, by virtue of a rule of convenience, real estate, but not I think the real estate of the partnership. By virtue of the relations *612 existing between the parties a duty arose upon the part of the owner of the soil * * * to account to the partnership. The right of the partnership was a right to recover from the owner of the soil, not real estate but personal property to wit, money. Such a right is a chose in action which is personal property. * * * The duty of the owner of the soil is to pay money, not to give real estate or an interest therein. [100 A. at 755-756; citation omitted.[9]] *613 We believe Mississippi would apply the majority rule when faced with this issue. Accordingly, the partnership is entitled to a lien against decedent's estate equal to the value of improvements constructed with the funds or through the efforts of the partnership. We must now determine which improvements were constructed with partnership funds or efforts. The home of Jake Sr. and decedent was on the Richardson property at the time they purchased the tract. It could not have been constructed with partnership funds or through partnership efforts. Accordingly, the partnership is not entitled to a lien against decedent's estate in relation to the family house. Another improvement north of Highway 90 is the building known as the Party Store. Following their father's death, John and Jake Jr. quitclaimed any interest they had in the Party Store to decedent. Furthermore, when the building was destroyed in 1969, the partnership did not rebuild the building, rather it was rebuilt either by decedent or the tenant. Thus, whatever previous interest the partnership may have claimed in that structure was released long prior to decedent's death by the partnership. The remaining improvements *614 north of Highway 90 are the tennis courts. The record establishes that the partnership did not construct these improvements. Based on the foregoing, the partnership is not entitled to a lien in relation to any of the improvements north of Highway 90. The partnership, however, is entitled to a lien equal to the value of the improvements on the land south of Highway 90. It is clear that all of the improvements south of Highway 90 were built by and used by the partnership in its various businesses. The first building constructed after the purchase of the Richardson property was the building initially known as the Fiesta Restaurant and Lounge. John and various acquaintances provided the labor. Building supply contractors provided the construction material on the credit of Jake Mladinich and Sons and were repaid from the proceeds of the restaurant. The other building subsequently constructed south of Highway 90 was also built and, in the case of hurricane damage rebuilt, with partnership funds and effort. Therefore, the partnership is entitled to a lien equal to the value of the buildings on the property south of the highway. In sum, we find that Jake Sr. and decedent intended *615 that they would own and have control over the Richardson property. The property provided financial security for decedent upon the death of her husband and leverage to protect their interests. We also find that the partnership did construct the improvements on the property south of Highway 90, and it is therefore entitled to a lien against the property in the amount of the value of the improvements. Valuation
Both parties submitted appraisals regarding the value of the property in issue. The situation at bar is somewhat unusual. Respondent relies upon the appraisal used by petitioner in preparing the estate tax return, while petitioner now claims that appraisal is incorrect and relies upon a more recently prepared appraisal. The appraisal used by petitioner in preparing the estate tax return and relied upon by respondent at trial was prepared in 1985 by Roger Poulos. The Poulos report was based upon personal inspections of the property by Mr. Poulos on November 16, 1981, and on November 1, 1985, and on income and expense data provided by the Mladinich family and Charles Logan, the CPA for the partnership. The appraisal relied upon by petitioner at trial was prepared in *616 1990 by Joel Stevenson. In many instances the two reports do not differ widely; there are, however, certain glitches in Mr. Stevenson's report that do not appear to be present in the appraisal of Mr. Poulos. Furthermore, Mr. Stevenson did not have the actual income and expense data that were supplied to Mr. Poulos and Mr. Stevenson's inspection of the property occurred approximately 7 years after decedent's death, while Mr. Poulos's inspections were 2 years before and 2 years after her death. Accordingly, we conclude that the Poulos report is based on better information and rely upon it. [10]
The Court has found that decedent owned *617 all of the land north of Highway 90 and the improvements thereon. Since this property is north of the seawall, it is not affected by the tidelands litigation. The Poulos report places the value of the property (i.e., land and improvements) north of Highway 90 on the date of decedent's death at $ 210,000. The Court concludes that this is the correct value of the property. Valuation of the property south of the highway may be complicated by the tidelands litigation. As discussed above, title to the tidelands has been the subject of extensive litigation. It is not necessary, however, for this Court to decide the issue or to predict the outcome of the litigation. The issue which the Court must resolve is the fair market value of the property on the date of decedent's death. Sec. 2031; sec. 20.2031-1(b), Estate Tax Regs. The tidelands litigation, therefore, affects this case only to the extent that it affected the fair market value of the subject property on the date of decedent's death. Mr. Poulos prepared his appraisal using the comparable sales method of valuation to determine the value of the land. His report included a large number of comparable sales which occurred after *618 institution of the case by Cinque Bambini. His report, therefore, necessarily reflects the then-perceived effect of the tidelands litigation on the value of gulf-front property. Consequently, we need not separately discuss the effect of the litigation on the property. The Poulos report determined the value of the property (i.e., land and improvements) south of Highway 90 known as the Fiesta property to be $ 792,000 on the date of decedent's death. The report attributes $ 379,000 to the land and $ 413,000 to the value of the improvements. Accordingly, we conclude that decedent's estate includes the value of the land ($ 379,000) underlying the Fiesta property. The Poulos report further found that the Cabana Beach and Tower Apartments had a value of $ 660,000 at the date of decedent's death. The report allocates $ 187,000 to the value of the land and $ 473,000 to the value of the improvements. Accordingly, we conclude that decedent's estate includes the value of the land ($ 187,000) underlying the Cabana Beach and Tower Apartments. Decedent's estate also includes her one-ninth of the value of the improvements south of the highway as her interest in the partnership. Addition *619 to Tax Under Section 6651(a)(1)
By her will, decedent appointed her two sons, Jake Jr., and John, coexecutors of her estate. While they were coexecutors, they had a disharmonious relationship and did little toward the administration of decedent's estate. One duty they did perform was to obtain an appraisal of the estate from Mr. Poulos that indicated that an estate tax return was necessary. They did not, however, file an estate tax return. The coexecutors subsequently resigned and the Chancery Court of Harrison County, Mississippi, appointed Peoples Bank as administrator d.b.n. of the estate on February 8, 1985. Peoples Bank obtained a second appraisal of the estate from Mr. Poulos. This second appraisal is similar to his first appraisal and is the one respondent relied upon at trial. Based upon that appraisal, Peoples Bank filed a Federal estate tax return for decedent's estate on June 30, 1986. During 1983 an estate tax return was required to be filed if the value of the gross estate exceeded $ 275,000. Sec. 6018(a). Estate tax returns are generally due to be filed within 9 months of the date of death. Sec. 6075(a). Section 6651(a)(1) provides an addition to tax on *620 returns filed after the applicable due date unless the delay is due to reasonable cause and not due to willful neglect. The addition to tax is 5 percent for the first month and for each full or partial month thereafter up to a maximum of 25 percent. Decedent died on October 8, 1983. The estate tax return was filed on June 30, 1986, almost 33 months after decedent's death. Petitioner is liable for the full addition to tax for failure to timely file unless it establishes that the failure was due to reasonable cause and did not result from willful neglect. United States v. Boyle, 469 U.S. 241, 245, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985). To demonstrate reasonable cause, the taxpayer filing a late return must show that he "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The fiduciary of an estate has an affirmative duty to ascertain the nature of his responsibilities, and the failure to do so does not constitute ordinary business care and prudence. United States v. Boyle, 469 U.S. at 249-250; Estate of Lammerts v. Commissioner, 54 T.C. 420, 446 (1970), *621 affd. on this issue 456 F.2d 681 (2d Cir. 1972). Willful neglect includes a "reckless indifference" to the duties imposed. United States v. Boyle, 469 U.S. at 245. Jake Jr. and John were the executors of their mother's estate until March 8, 1985. Yet, they made no effort to file the estate tax return. They allege that they did not file an estate tax return because they believed that the value of the estate was less than $ 275,000. However, this claim has a decidedly hollow ring. They had an appraisal by Mr. Poulos that revealed the value of the estate and that an estate tax return was necessary. The failure was due to nothing less than reckless disregard of their duties caused by their animosities to each other. By failing to file a tax return within the prescribed time limitations, the coexecutors failed to exercise ordinary business care and prudence. Accordingly, we hold that petitioner is liable for the addition to tax under section 6651(a)(1). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code, as amended and in effect as of the date of the decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise indicated.↩
2. While a partnership apparently originally operated a restaurant and bar, for a more complete history of its operation, see Mladinich v. Commissioner, T.C. Memo 1969-185↩.
3. Respondent included the value of the Sea 'n' Sirloin among the adjustments in the statutory notice of deficiency but has conceded that the restaurant is not includable in decedent's gross estate.↩
4. See transcript of proceedings in Jake Mladinich, Sr. and Mary Mladinich v. United States, 1965 U.S. Dist. LEXIS 9351↩, Civ. No. 2694, (S.D. Miss., filed July 16, 1965).
5. In Mladinich v. Commissioner, T.C. Memo 1969-185, and Mladinich v. United States, 1965 U.S. Dist. LEXIS 9351, 18 A.F.T.R.2d (RIA) 5551, 66-1 U.S. Tax Cas. (CCH) P9429 (S.D. Miss. 1965), vacated and remanded 371 F.2d 940 (5th Cir. 1967), on remand 394 F.2d 147↩ (5th Cir. 1968), cases which involved unreported income from illegal gambling operations, John and Jake Jr. testified that Jake Sr. had a cash hoard of $ 35,000 after 1950. This Court and the United States District Court rejected that testimony.
6. We also note petitioner is asking this Court to extend the reasoning of Whitney v. Cotten, 53 Miss. 689 (1876) and Alexander v. Kimbro, 49 Miss. 529 (1873). In both of those cases, record title was in the name of a partner of the partnership. In the case before us, record title was in the name of a partner and one who was not a partner at the time the property was acquired. Petitioner is thus asking this Court to divest a record titleholder from her interest as a surviving spouse in a tenancy by the entirety based upon the intent of the partners. Petitioner cites no case in which a court so stripped a widow of her interest, nor has the Court found such a case. We note that such a decision would appear to violate principles established in Carter v. Sunray Mid-Continent Oil Co., 231 Miss. 8, 94 So. 2d 624 (Miss. 1957), and Wolfe v. Wolfe, 207 Miss. 480, 42 So. 2d 438↩ (Miss. 1949).
7. Petitioner contends that we should disregard these early tax returns because they were not prepared by knowledgeable tax professionals. But, for that very reason, these returns probably reflect the true intent of the parties during this period because in all likelihood they were based on contemporaneous statements of those concerned.↩
8. See supra↩ note 5.
9. See also Marston v. Marston, 277 Mass. 129, 177 N.E. 862, 863 (1931) ("If the buildings in question were held not to be partnership property the father would receive a larger share of the profits of the partnership than either of his partners."); Minikin v. Hendrix, 15 Cal. 2d 338, 101 P.2d 473, 476 (1940), citing with approval Flint v. Flint, 87 N.J. Eq. 560, 100 A. 754 (Ch.), affd. 88 N.J. Eq. 346, 102 A. 1053 (Err. & App. 1917), and Marston ("the improvements became a partnership asset and, as such, on dissolution of the partnership the non-landowning partner was entitled to his proportionate share of their value."); Wiese v. Wiese, 107 So. 2d 208 (Fla. App. 1958) (after agreeing with the reasoning set out in Minikin and Flint, the court awarded the non-landowning partner one-half the value of the improvements made to defendant's land); Gabrielle v. Marini, 80 R.I. 458, 98 A.2d 363, 366 (1953) ("Where partnership funds and credit are thus employed to improve real estate used in the partnership, the liquidating partner who owns the real estate is liable to the other partner for his share of the net enhanced value of such improvements after lawful and proper deductions are made."). But compare Knauss v. Hale, 64 Idaho 218, 131 P.2d 292↩ (1942), the only case which departs from the general rule enunciated above.
10. We reject petitioner's claim that the Poulos appraisal is somehow less reliable than the Stevenson appraisal since the latter was subject to cross-examination and the former was not. Petitioner had the opportunity to call Mr. Poulos as a witness but chose not to do so. If petitioner felt that there are erroneous items in the Poulos report, it should have called Mr. Poulos at trial.↩